| | | |
|---|---|---|
| **FREDERICK MOORE, Administrator** | ) | |
| **and Personal Representative of the** | ) | |
| **Frederick Grady Estate,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 04 C 2545** |
| | ) | |
| **OFFICER LEO MORALES, Star #4479,** | ) | **Judge Ruben Castillo** |
| **OFFICER LUIS GARZA, Star #18948,** | ) | |
| **OFFICER DONALD TULEJA, Star #3849,** | ) | |
| **SERGEANT D. BOYLE, Star #1294,** | ) | |
| **CAPTAIN R. MILLER, Star #115,** | ) | |
| **JOSEPH PALMSONE, Star #309119,** | ) | |
| **and DEMETRIUS WILLIAMSON,** | ) | |
| **Star #305598, Individually** | ) | |
| **and in their Official capacity as City of** | ) | |
| **Chicago Police Officers and/or employees of** | ) | |
| **the Chicago Police Department,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

This case arises out of the tragic death of Frederick Grady ("Mr. Grady") on April 8 or 9,

2003, while he was in the custody of several officers and employees of the Chicago Police

Department ("CPD"). Plaintiff Frederick Moore ("Moore"), as Mr. Grady's eldest son and the

administrator of Mr. Grady's estate, brings suit under 42 U.S.C. § 1983, alleging violations of the

Fourth and the Fourteenth Amendments. Moore filed his initial complaint on April 9, 2004, and

his current fifth amended complaint on October 7, 2005. Moore names as defendants Officer

Leo Morales, Officer Luis Garza, Officer Donald Tuleja, Sergeant D. Boyle, Captain R. Miller,

Detention Aide Joseph Palmsone, and Detention Aide Demetrius Williamson (collectively

"Defendants") in their individual and official capacities. Moore claims that Defendants did not

have probable cause to arrest Mr. Grady and that Mr. Grady suffered physical pain, significant bleeding, and death as a result of Defendants' use of excessive force or, in the alternative, as a result of Defendants' deliberate indifference to Mr. Grady's medical needs in violation of Section 1983. Currently before this Court is Defendants' motion for summary judgment. (R. 112, Defs.' Summ. J. Mot.) For the following reasons, this motion is denied in part and granted in part.

## RELEVANT FACTS[1]

### I.     Mr. Grady's Accident

On April 8, 2003, shortly after 6:00 p.m., Frederick Grady was involved in a two car, rollover traffic accident near the intersection of Clark and 18th Streets in the City of Chicago. (R. 114, Def.'s Facts ¶ 5.) Mr. Grady was the driver of one of those vehicles and had to be extricated from his van by the Chicago Fire Department ("CFD"). (Id. ¶ 6.) Mr. Grady was wearing his seat belt during the accident. (Id. ¶ 7.) Upon arrival, CFD paramedics John Kaveney and Renee Sanchez observed Mr. Grady walking around the scene of the accident. (R. 114, Defs.' Facts ¶ 8.) Mr. Grady told the paramedics that he was uninjured and the paramedics documented no observed signs of injury to Mr. Grady as a result of the accident. (Id. ¶ 9; R. 128,

---

[1]These facts are derived from the parties' statements of facts filed pursuant to Local Rule 56.1(b). Unless otherwise indicated, the facts included herein are undisputed. The Court, however, admonishes the Plaintiff to be more careful in his future filings with this Court and his compliance with the local rules. Plaintiff's response to Defendants' statement of facts, for example, lacks clarity and forces this Court to try to determine on its own which facts the Plaintiff has admitted and which facts are being denied. See Malec v. Sanford, 191 F.R.D. 581, 584 (N.D. Ill. 2000) (discussing the nonmovant's duty to explain and justify any factual disputes warranting denial of summary judgment).

2

Pl.'s Resp. to Defs.' Facts ¶ 9.) According to the ambulance report, Mr. Grady refused treatment, although it is not clear if he suffered from minor bumps and bruises from the accident or no injuries at all. (R. 128, Pl.'s Resp. to Defs.' Facts ¶ 7; R. 114, Defs.' Facts ¶ 7.) Mr. Grady refused transportation to the hospital for further evaluation. (R. 114, Defs.' Facts ¶ 10.)

Defendants claim that while the paramedics were documenting Mr. Grady's refusal of treatment in their records, Mr. Grady returned to the paramedics with a laceration to his right hand that he somehow sustained while trying to re-enter his overturned vehicle. (Id. ¶ 11.) Defendants further claim that Mr. Grady allowed the paramedics to dress his wound with sterile bandages, but refused further medical treatment. (Id. ¶ 12.) It is not clear if Moore disputes whether Mr. Grady in fact injured his hand after the accident or the manner in which Mr. Grady injured his hand. Moore does not admit or deny the statement, but states that "[m]aterial facts are in dispute as to whether Mr. Grady, in fact, severely lacerated his right hand after the accident by cutting his hand on glass or some other sharp object" and he further states that the laceration is the result of "blunt force trauma." (R. 128, Pl.'s Resp. to Defs.' Facts ¶ 11.) He further disputes whether Mr. Grady allowed the paramedics to dress his wound since the traffic crash report indicates that Mr. Grady refused treatment. (Id. ¶ 12.) Mr. Grady signed the paramedics' report, acknowledging that he was refusing further medical care and had been warned of the risks of not going to the hospital. (R. 114, Defs.' Facts ¶ 13.)

## II.    Mr. Grady's Arrest

A City of Chicago Streets and Sanitation ("CCSS") tow truck towed Mr. Grady's vehicle, although the parties dispute where the vehicle was towed to. (R. 128, Pl.'s Resp. to Defs. Facts ¶ 14.) After the accident, Mr. Grady's vehicle ended up on a private lot located at 1913 S.

3

Jefferson in Chicago, although it is unclear whether CCSS towed it there. (R. 132-1, Defs.'
Resp. to Pl.'s Add'l Facts ¶ 1.) Shortly after 8:00 p.m., Wallace Lockard, the owner of the lot,
called the CPD to report a trespasser on the property. (R. 114, Defs.' Facts ¶ 15.) Chicago
Police officers Garza and Morales responded to the scene. (Id. ¶ 18.) They observed a man
standing on the lot behind the locked fence. (Id.) Lockard told the officers that the man inside
the gate did not have permission to be there. (Id.) Lockard opened the gate and Garza and
Morales handcuffed the man, whom they learned was Mr. Grady, and placed him in the back of
their squad car. (Id. ¶ 19.) Although Lockard signed a complaint charging Mr. Grady with
criminal trespass, it is disputed whether Mr. Grady was actually trespassing. (R. 128, Pl.'s Resp.
to Defs.' Facts ¶¶ 18-20.) Upon his arrest, Mr. Grady informed the officers that he was trying to
get his tools from his van, which was on the lot. (R. 114, Defs.' Facts ¶ 21; R. 132-1, Defs.'
Resp. to Pl.'s Add'l Facts ¶ 3.) Morales and Garza arrested Mr. Grady at approximately 8:45
p.m. on the evening of April 8, 2003. (R. 132-1, Defs.' Resp. to Pl.'s Add'l Facts ¶ 19.)

    It is disputed whether Mr. Grady had a gauze bandage or any injury at all on one of his
hands at the time of his arrest. The City claims that his hand was bandaged, but neither Garza
nor Morales observed any blood coming from the bandage while Mr. Grady was in their custody.
(R. 114, Defs.' Facts ¶¶ 22, 26.) The City further claims that Mr. Grady informed one of the
arresting officers that he injured his hand around the time of the car accident, which the officers
assumed was treated by paramedics on the scene. (Id. ¶ 23.) Moore claims that material facts
are in dispute as to whether Mr. Grady had a bandage on his hand when he was arrested because
none of the Defendants noted any injuries on any report prior to Mr. Grady's death. He also
disputes whether Mr. Grady informed officers at the scene that he been injured shortly after the

4

car accident. (R. 128, Pl.'s Resp. to Defs. Facts ¶¶ 22, 23, 26.)

When Morales and Garza transported Mr. Grady to the 12th District Police Station, Morales handcuffed Mr. Grady to a bar in the police station for nearly two hours. (R. 132-1, Defs.' Resp. to Pl.'s Add'l Facts ¶ 20.) During those two hours, Morales did not recall seeing any blood coming from Mr. Grady's hand nor did he send Mr. Grady to receive medical treatment. (*Id.* ¶ 22.) While in the police station, one of the officers asked Mr. Grady if he needed any medical attention to which Mr. Grady responded no. (R. 114, Defs.' Facts ¶ 24.) The parties dispute Mr. Grady's reasons for declining medical attention. Defendants argue that he was injured but declined medical attention, and Moore claims that he was not injured and declined medical treatment. (*Id.* ¶ 22; R. 128, Pl.'s Resp. to Defs.' Facts ¶ 24.) After the paperwork for Mr. Grady's arrest was completed, the arresting officers transported him to the lockup. (R. 114, Defs.' Facts ¶ 26.)

## III. Mr. Grady's Lockup

Mr. Grady was admitted into the lockup at approximately 10:30 p.m. (R. 114, Defs.' Facts ¶ 27.) Tuleja was the lockup keeper at the time Mr. Grady was brought into the lockup. Palmsone and Williamson assisted Tuleja in the processing of prisoners. (*Id.* ¶ 28.) The lockup process includes taking custody of the prisoner from the arresting officer; taking the prisoner's personal property and depositing it into a bag; searching the prisoner's person (without removing his pants or bottom layer shirt); observing and asking questions of the prisoner to assess the need for medical or mental health treatment; photographing and fingerprinting the prisoner; allowing a telephone call; and finally, placing the prisoner in a jail cell. (*Id.* ¶ 30.) Mr. Grady was processed in accordance to this procedure and was not rejected from the lockup because of any

5

injuries. (*Id.* ¶ 31; R. 132-1, Defs.' Resp. to Pl.'s Facts ¶ 37.) After Mr. Grady made a phone call, Palmsone escorted Mr. Grady to his cell. (R. 114, Defs.' Facts ¶ 36.) Mr. Grady walked on his own accord, was cooperative, and did not appear to be in any distress. (*Id.*)

Palmsone checked the well-being of all prisoners by walking by each of the jail cells approximately every fifteen minutes, and documented each of these checks in a log. (*Id.* ¶ 41.) After Mr. Grady was placed in his jail cell, Palmsone checked him several times. (*Id.* ¶ 42.) Mr. Grady was asleep during the majority of the time he was in his cell. (*Id.*) Boyle and Miller also toured the lockup and neither observed anything wrong with Mr. Grady and they were never told that he needed medical attention. (*Id.* ¶ 43.) Williamson also made rounds and did not notice anything wrong with Mr. Grady. (*Id.* ¶ 44.) At no time did Mr. Grady request medical attention. (*Id.* ¶ 45.) At approximately 1:30 a.m. on April 9, 2003, Palmsone noted that Mr. Grady was awake and sitting up on the bench in his cell. (*Id.* ¶ 46.) Mr. Grady did not appear to be in distress and did not make any requests. (*Id.*) Palmsone did not enter the cell at that time. (*Id.*)

## IV.    Mr. Grady is Found Unresponsive in His Jail Cell

At approximately 1:30 or 1:35 a.m., Robert Gonzales, another inmate, heard a thud-like sound come from Mr. Grady's cell. (R. 114, Defs.' Facts ¶ 48.) At approximately 1:50 a.m., Palmsone was in the process of checking on the prisoners and taking some of the prisoners out of their cells to bond out. (*Id.* ¶ 48.) When Palmsone went to retrieve Mr. Grady, he found him lying on the floor of his cell. (*Id.*) Palmsone called out to Mr. Grady, briefly shook him, and received no response. (R. 114, Defs.' Facts ¶ 52.) The parties dispute whether Palmsone observed any injuries on Mr. Grady when he discovered him on the floor. (R. 128, Pl.'s Resp. to Defs.' Facts ¶ 51.) Palmsone told Tuleja, his supervisor, that Mr. Grady was lying on the floor

6

unresponsive. (R. 114, Defs.' Facts ¶ 52.) Tuleja checked on Mr. Grady and then went back to his desk and called for an ambulance. (*Id.* ¶ 53.) Williamson and Boyle also went into the lockup to check on Mr. Grady, but neither entered his cell. (*Id.* ¶ 55.) Miller did not enter the lockup until after the paramedics arrived.[2] (*Id.* ¶ 56.)

The paramedics who responded to the call for assistance, Kaveney and Sanchez, were the same paramedics who had been in contact with Mr. Grady earlier that evening after his car accident. (*Id.* ¶ 58.) Upon arrival, they found Mr. Grady to be in cardiac arrest and took him to the hospital. (*Id.*) The parties dispute the condition of the cell after Mr. Grady was taken away. Defendants contend that there was never any pool of blood or blood splatter in the cell. (*Id.* ¶ 61.) They also state that the jail cell was never cleaned at any time while Mr. Grady was inside of it or after he was removed by the paramedics. (*Id.*) Defendants also state that after Mr. Grady was removed from the cell, investigators who went inside the cell saw what they believed to be a droplet of blood on the floor. (*Id.* ¶ 62.) While Moore agrees that only a droplet of blood remained in the cell after Mr. Grady was found, he argues that there is an issue of fact as to whether there was ever a pool of blood in the cell that someone cleaned up either while Mr. Grady was present or after he was removed from the cell. (R. 128, Pl.'s Resp. to Defs.' Facts ¶¶ 61-62.)

Despite the efforts of paramedics and medical professionals, Mr. Grady was pronounced dead at Rush Hospital. (*Id.* ¶ 63.) According to the paramedics, when they arrived at the lock-up Mr. Grady had an abrasion on his forehead and nose and a bandage on his right hand. (*Id.* ¶ 64.)

---

[2]The parties dispute whether anyone entered Mr. Grady's cell prior to the time he was found unresponsive on the floor of his cell at approximately 1:50 a.m. (*Id.* ¶ 49; R. 128, Pl.'s Resp. to Defs.' Facts ¶ 49.)

7

An autopsy conducted by Dr. Eupil Choi of the Cook County Medical Examiner's Office revealed that Mr. Grady died of coronary heart disease and the cause of death was natural. (*Id.* ¶ 65.) Dr. Choi's autopsy noted a bloody bandage covering a quarter inch deep laceration between the middle and ring fingers on Mr. Grady's right hand. (*Id.* ¶ 66.) The laceration did not appear to have blood coming from it. (*Id.*) Dr. Choi noted a .2 inch abrasion on the top of Mr. Grady's right wrist as well as a four-by-two-inch bruise at the left clavicle. (*Id.* ¶ 67.) Dr. Choi's autopsy revealed two abrasions on Mr. Grady's forehead, which could have been caused by falling down against something or being struck by something. (*Id.* ¶ 68.)

On April 10, 2003, Frederick and Tommie Moore, Mr. Grady's sons, went to the morgue to identify his body and they observed the bruises on Mr. Grady's head and neck. (*Id.* ¶¶ 73-74.) Dr. Michael Kaufman, a pathologist hired by Mr. Grady's family, performed a second autopsy on May 9, 2003. Similar to Dr. Choi, he concluded that Mr. Grady died of a sudden, unexpected cardiac death secondary to a presumed fatal cardiac arrhythmia. (*Id.* ¶ 69.) He also concluded that the abrasions to Mr. Grady's head could have occurred from a fall from a seated or standing position. (R. 114, Defs.' Facts ¶ 71.) The parties dispute, however, whether the condition of Mr. Grady's heart was so severe that any injuries to Mr. Grady at the time of his death could have caused or contributed to Mr. Grady's death. (*Id.* ¶ 70; R. 128, Pl.'s Resp. to Defs.' Facts ¶ 70.) The parties also dispute whether the bruising near Mr. Grady's left clavicle could have been caused by a seat belt, (R. 114, Defs.' Facts ¶ 72; R. 128, Pl.'s Resp. to Defs.' Facts ¶ 72), but agree that the abrasion on the back of Mr. Grady's right wrist was the result of handcuffs. (*Id.*)

A few days after the second autopsy, Diane McGhee—Mr. Grady's sister—sought the services of an attorney. (R. 128, Pl.'s Resp. to Defs.' Facts ¶ 76.) This lawsuit followed soon

after.

## LEGAL STANDARDS

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must "construe all facts in the light most favorable to the nonmoving party and draw all reasonable and justifiable inferences in favor of that party." *King v. Preferred Tech. Group*, 166 F.3d 887, 890 (7th Cir. 1999). "Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004) (internal citations omitted); *O'Neal v. City of Chi.*, 392 F.3d 909, 912 (7th Cir. 2004).

## LEGAL ANALYSIS

### I.    Probable Cause for Arrest

Moore alleges that defendants Garza and Morales did not have probable cause to arrest Mr. Grady for trespassing and as a result, violated his Fourth Amendment rights as protected by Section 1983. Section 1983 provides that any person who "subjects . . . any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law." 42 U.S.C. § 1983. The Fourth Amendment provides persons with the right "to be secure in their persons, houses, papers, and

9

effects, against unreasonable searches and seizures." U.S. CONST. amend. IV; *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751 (7th Cir. 2006). The Fourth Amendment protects those individuals held in custody after the initial seizure but before the formal arraignment or probable cause hearing. *Pyka v. Vill. of Orland Park*, 906 F. Supp 1196, 1217-1218 (N.D. Ill. 1995).

In evaluating whether a police officer had probable cause to arrest a suspect, the court considers the facts and circumstances of which the officer was aware of at the time of the arrest and the applicable state law. *Pourghoraishi*, 449 F. 3d at 761. The probable cause assessment varies with the need for prompt action and the quality of the available information. *Maxwell v. Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1987) (citations omitted). With respect to the latter, the key question is whether the information relied upon was reasonably trustworthy "'to warrant a prudent man in believing' that the arrestee" had committed a crime. *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1246 (7th Cir. 1994) (citations omitted). Generally, a police officer is not expected to conduct an investigation; in fact, a statement by the victim of the crime will usually suffice. *Askew v. City of Chi.*, 440 F.3d 894, 895 (7th Cir. 2006); *Gramenos v. Jewel Co.*, 797 F.2d 432, 439 (7th Cir. 1986). However, if something about the victim or his report would lead a reasonable officer to question the victim's reliability, then the officer must proceed with a more thorough investigation before making an arrest. *Hebron v. Touhy*, 18 F.3d 421, 422-23 (7th Cir. 1994).

In the present case, defendants Garza and Morales responded to a call by the lot owner regarding a trespasser. Under Illinois law, "[w]hoever . . . remains upon the land of another, after receiving notice from the owner or occupant to depart . . . [c]ommits a Class B misdemeanor." 720 ILCS 5/21-3(a)(3)(2002). At the scene, the officers observed Mr. Grady standing behind a

10

locked gate on the property and the owner informed the officers that Mr. Grady was not lawfully on the property and signed a complaint to that effect. It appeared, therefore, that Mr. Grady was trespassing. Even though Mr. Grady denied the allegations and informed the officers that he was trying to get his tools from his van on the lot, his denial is insufficient to negate the existence of probable cause. *Askew*, 440 F.3d at 895.

Moore asserts that the complaining witness, Mr. Lockard, was not credible because he informed the officers that his business is only open between 9:00 a.m. and 5:00 p.m., that the gate is locked after 5:00 p.m., and that he had no way of knowing how Mr. Grady got on the lot behind the locked gate. Moore further argues that since the accident did not happen until 6:25 p.m., and Mr. Grady's van was towed to the lot after 8:00 p.m., Mr. Lockard must have lied about his gate always being locked after 5:00 p.m. However, Moore presents no evidence to support this conclusion, and the facts do not inevitably lead there.

As the Seventh Circuit has noted, "[p]olice need not conduct an investigation but may arrest and let prosecutors and courts determine who is telling the truth." *Id.* at 895. Mr. Lockard's version of the events is certainly plausible and there is nothing in the record to suggest that he lacked credibility. *See Sheik-Abdi*, 37 F.3d at 1247 (noting that an officer has probable cause when he has received his information from a victim or an eye witness who seems reasonably truthful). Accordingly, Moore's claim that Mr. Grady was arrested without probable cause is dismissed.

## II. Moore's Claims for Excessive Force, Failure to Obtain Medical Treatment, and Failure to Intervene

Moore has two theories of liability which hinge on the timing of Mr. Grady's hand injury.

11

Whether Mr. Grady sustained the hand injury before or after his arrest is currently in dispute.

Moore argues that if the evidence shows that Mr. Grady sustained the injury after his arrest,

Defendants are liable for excessive force. If he sustained the hand injury before his arrest, Moore

argues that they are liable for their failure to provide adequate medical treatment. We will

address each of these arguments in turn.

## A. Excessive Force

Moore claims that Palmsone, Williamson, and Tuleja used excessive force against Mr.

Grady, which led to his death. Defendants' potential liability for excessive force turns on

whether their use of force—if in fact they used any force—was objectively reasonable. *Estate of*

*Phillips v. City of Milwaukee*, 123 F.3d 586, 592 (7th Cir. 1997) (citing *Graham v. Connor*, 490

U.S. 386 (1989)). The Seventh Circuit has described the contours of this standard as follows:

> The reasonableness standard cannot be defined precisely, nor should it be applied
> in a mechanical fashion. Determining whether the force used to effect a particular
> seizure is reasonable under the Fourth Amendment requires a careful balancing of
> the nature and quality of the intrusion on the individual's Fourth Amendment
> interests against the countervailing governmental interests at stake. Due to the
> fact-specific nature of the inquiry, the determination whether a police officer
> utilized excessive force depends on the totality of the circumstances surrounding
> the encounter. We must pay careful attention to the facts and circumstances of
> each particular case, including the severity of the crime at issue, whether the
> suspect posed an immediate threat to the safety of the officers or others, and
> whether he [was] actively resisting arrest or attempting to evade arrest by flight.
> In addition, the reasonableness inquiry is an objective one: [t]he particular use of
> force must be judged from the perspective of a reasonable officer on the scene,
> rather than with the 20/20 vision of hindsight. The question is whether the
> officers' actions are objectively reasonable in light of the facts and circumstances
> confronting them, without regard to their underlying intent or motivation.

*Id* (internal citations and quotations omitted). Here, Moore claims that Palmsone, Williamson,

and Tuleja beat Mr. Grady while he was in his cell without any justification.

In *Brownell v. Figel*, 950 F.2d 1285 (7th Cir. 1991), the Seventh Circuit rejected an excessive force claim where the plaintiff, who was involved in a car accident, was taken unparalyzed to a hospital and was subsequently found to be paralyzed after leaving the hospital and being in police custody. The Court rejected the plaintiff's excessive force claim "absent any evidence of specific unreasonable conduct on the part of the officers." *Id.* at 1292. Moore's claim seems to suffer from a similar deficiency: he is unable to point to specific unreasonable conduct on the part of the individual officers. The instant case, however, can be distinguished from *Brownell* because Defendants claim that Mr. Grady was injured prior to his arrest, but neither the traffic crash report (R. 125-2), the arrest report (R. 125-3), the case report (R. 125-4), or Palmsone's general progress report (R. 125-8) mention anything about his injuries. *See Abdullahi v. City of Madison*, 423 F.3d 763, 772 n.7 (7th Cir. 2005) ("The award of summary judgment to the defense in deadly force cases may be made only with particular care where the officer defendant is the only witness left alive to testify . . . so a court must undertake a fairly critical assessment of . . . the officer's original reports or statements . . . "). Defendants also admit that Mr. Grady declined medical treatment several times prior to his admission to the lockup. (R. 132-1, Defs.' Resp. to Pl.'s Add'l Facts ¶ 27.) Thus, the undisputed evidence establishes that Mr. Grady was injured at some point prior to his death. This evidence is sufficient to create a triable issue of fact as to whether there was unreasonable conduct on the part of the officers. *See Abdullahi*, 423 F.3d at 772 (stating that cases may always be proven by circumstantial evidence where direct evidence is unavailable)

Based on the pictures submitted to this Court illustrating the severity of Mr. Grady's injuries and the lack of any documentation of Mr. Grady's injuries by the police, a reasonable

13

factfinder might conclude that Mr. Grady sustained his injuries while in police custody. Defendants contend that Mr. Grady obtained his injuries from the car accident prior to his arrest and that the head injuries occurred as a result of a fall from a seated or standing position. This Court is required, however, to view the record in the light most favorable to the nonmoving party, *King*, 166 F.3d at 890, and it is not for us to decide, without more, whose version of events is more plausible, *see Pinkston v. Madry*, 440 F.3d 879, 890 (7th Cir. 2006) (noting that a court cannot weigh evidence, resolve conflicts, and decide for itself where the preponderance lies at the summary judgment stage).

Moreover, the medical evidence presented by Moore raises issues of fact about the manner in which Mr. Grady was injured and the time at which he actually received his injuries. Dr. Kaufman, the doctor hired to do the second autopsy on Mr. Grady, stated that the injuries to Mr. Grady's head were consistent with blunt force trauma and the injury to Mr. Grady's hand was consistent with a defensive wound. (R. 125, Pl.'s Resp. to Mot. for Summ. J., Ex. Y, Kaufman Dep. at 72, 114.) Dr. Patrick Besant-Matthews, a former medical examiner and expert witness for the Plaintiff, stated that the laceration on Mr. Grady's hand would have bled significantly and would have been painful from the moment it occurred. (*Id.*, Ex. JJ, Matthews Aff.) Dr. Besant-Matthews further stated that there was no sign of adherent blood clotting, which gives the impression that the wound occurred much closer to the time of Mr. Grady's death rather than seven hours earlier as Defendants allege. (*Id.*) Based on this evidence, it is clear that there is an issue of material fact as to whether the defendants used excessive force. *Abdullahi*, 423 F.3d at 772 (stating that "medical evidence and other circumstantial evidence can be sufficient to create triable issues of fact in excessive force cases"). Accordingly, summary

14

judgment is denied on the excessive force claim.

## B. Failure to Intervene

Moore claims that Defendants Tuleja,[3] Boyle, and Miller are liable for failure to intervene to prevent Palmsone's and Williamson's use of force against Mr. Grady. The Fourteenth Amendment imposes an affirmative duty on all law enforcement officials "to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994); *Medley v. Turner*, 869 F. Supp. 567, 572 (N.D. Ill. 1994). An officer may be liable for failure to intervene where that officer observes or has reason to know:

> (1) that excessive force is being used; (2) that a citizen has been unjustifiably arrested; or (3) that any constitutional violation has been committed by a law enforcement official. In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring. Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.

*Anderson*, 17 F.3d at 557; *see also Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994); *Abdullah*, 423 F.3d at 774. Because Mr. Grady could have received his wounds at any time during the three hours he was in lockup, a reasonable factfinder could also find that there were multiple opportunities for defendants Tuleja, Boyle, or Miller to intervene to prevent the infringement of Mr. Grady's constitutional rights. *Abdullahi*, 423 F.3d at 774 (noting that where plaintiff's excessive force claims are not amenable to summary judgment, then the associated failure to

---

[3]Moore claims that either Tuleja used excessive force, or in the alternative, failed to prevent the use of force by Palmsone and/or Williamson.

intervene claims must also go to trial). It is undisputed that Boyle and Miller toured the lockup, checking on the well-being of each prisoner in the lockup as a part of their responsibilities. (R. 114, Defs.' Facts ¶ 43.) It is possible, therefore, that if any of the other officers beat Mr. Grady, Boyle and Miller had an opportunity to prevent it. Tuleja was the lockup keeper at the time Mr. Grady entered lockup and he had access to Mr. Grady. (*Id.* ¶¶ 28, 53.) Even if he did not actually engage in the alleged beating of Mr. Grady, a reasonable factfinder could find that he was in a position to prevent Mr. Grady's beating from occurring. It is also noteworthy that defendants Tuleja, Boyle, and Miller did not recall seeing Mr. Grady's undisputed injuries until he was found on the floor of his cell. Accordingly, we deny summary judgment on Moore's failure to intervene claim.

## C.    Failure to Seek Medical Care

Moore argues, in the alternative, that if Mr. Grady was injured prior to his arrest, Defendants failed to seek medical care in violation of the Due Process Clause of the Fourteenth Amendment. "A state official violates the due process rights of a pretrial detainee [or an arrested person] when she acts with deliberate indifference toward the detainee's serious medical needs." *Xing Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999); *see also Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001). As the Seventh Circuit has stated, "'deliberate indifference' is simply a synonym for intentional or reckless conduct, and that 'reckless' describes conduct so dangerous that the deliberate nature of the defendant's actions can be inferred." *Xing Qian*, 168 F.3d at 955. To demonstrate failure to provide medical care, Moore must show that: (1) an objectively serious injury or medical need was deprived; and (2) the official knew that the risk of injury was substantial but nevertheless failed to take reasonable measures to prevent it. *Chapman*, 241 F.3d

16

at 845. An objectively serious injury or medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Id.* Secondly, the detainee must show "that the official was aware of the risk and consciously disregarded it nonetheless." *Id.* Under this prong, the relevant inquiry is "whether the official actually knew about the plaintiff's condition, not whether a reasonable official should have known." *Xing Qian*, 168 F.3d at 955.

Moore has not presented any evidence that defendants Garza, Morales, Tuleja, Palmsone, and Williamson ignored an objectively serious injury or medical need. In his Rule 56.1 response to Defendants' facts, Moore states:

> there was nothing that would have given Defendants Garza and Morales the impression that Mr. Grady was in need of medical attention because he was not in need of medical attention at that time because his hand was not lacerated [at the time of his arrest], he did not have a bruise on the back of his right wrist, he did not have bruises on his neck, and he did not have multiple wounds on his head at the time.

(R. 128, Pl.'s Resp. to Defs.' Facts ¶ 25.) He further states that defendants Tulelja, Palmsone, and Williamson did not see a bandage anywhere on Mr. Grady when Morales and Garza transferred Mr. Grady into the lockup area. (*Id.* ¶¶ 26, 27.)

Moore attempts to style this claim as an alternative grounds for relief in the event that we accept Defendants' interpretation of the facts, which is acceptable under the Federal Rules of Civil Procedure. *See Brown v. U.S.*, 976 F.2d 1104, 1108 (7th Cir. 1992) (stating that parties can pursue alternative and inconsistent claims). However, this Court cannot ignore admissions that Moore made in responding to Defendants' 56.1 statement in his attempt to show that there is a factual dispute with regards to the excessive force claim. *See FTC v. World Media Brokers*, 415

17

F.3d 758, 765 (7th Cir. 2005) (finding that admissions made by a party in her 56.1(a) responses are binding despite the party's later attempt to change her position). While parties can pursue alternative or inconsistent legal claims, admissions made in Rule 56.1 statements are still binding. Moore has denied that Mr. Grady was injured prior to being arrested and sent to lockup, therefore, this Court cannot find that Defendants refused to give Mr. Grady medical care for injuries that Moore claims Mr. Grady did not have at the time of his arrest.

Nonetheless, even if we accept Defendant's assertion that Mr. Grady was injured prior to his arrest for purposes of this claim, Moore's claim that Defendants were deliberately indifferent to Mr. Grady's need for medical treatment would fail. There are no facts to support Moore's theory that Defendants were aware that Mr. Grady was in need of medical attention when he entered police custody and were deliberately indifferent to that need. Moore admitted that Defendants asked Mr. Grady if he needed medical treatment and not only did Mr. Grady refuse treatment, he did not request treatment at any other time he was in custody. (R. 128, Pl.'s Resp. to Defs.' Facts ¶¶ 24-25, 39.) Moore claims that this refusal stemmed from the fact that Mr. Grady was not injured prior to his arrest and being placed in lockup. (Id. ¶ 39) Even assuming that Mr. Grady was injured, the fact that Defendants asked Mr. Grady if he needed medical attention and he refused demonstrates that they did not disregard Mr. Grady's medical needs, nor were they deliberately indifferent.[4] Accordingly, there is no issue of material fact to be resolved

---

[4]Even if Mr. Grady was injured at the time of his arrests, Defendants' still do not rise to the level of reckless disregard present in a recent case, *Davis v. Carter*, 05 C 1695, 2006 WL 1751893 (7th Cir. June 28, 2006). In that case, the Seventh Circuit held that there are genuine issues of material fact as to whether a defendant police officer recklessly disregarded the plaintiff's medical needs after the police officer failed to contact paramedics after finding out that the plaintiff was "dope sick," observed that the plaintiff was suffering, and heard the plaintiff complain that "it felt like someone was ripping [his] insides out." *Id.* at * 9. Even if Defendants

18

regarding Defendants' failure to provide medical care and we grant summary judgment on this claim.

## III.  Civil Conspiracy

Moore alleges that Defendants conspired to cover-up the use of excessive force against Mr. Grady. Under Section 1983, a conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Scherer v. Balkema*, 840 F.2d 437, 441 (7th Cir. 1988). To establish a prima facie case of civil conspiracy, a plaintiff must show "an express or implied agreement among defendants to deprive a plaintiff of his or her constitutional rights," and the "actual deprivation of those rights in the form of overt acts in furtherance of the agreement." *Id.* at 442.

Moore does not provide any evidence of an agreement, either express or implied, between the defendants. Moore alleges no facts connecting Morales and Garza to Mr. Grady once he was admitted to lockup. Moore fails to provide any evidence that Tuleja, Palmsone, Williamson, Boyle, or Miller had an express or implied agreement to injure Mr. Grady or to cover up any injury to him. Moore also does not provide any evidence that Defendants committed any overt acts in furtherance of the conspiracy. *See Scherer*, 840 F.2d at 442 (stating that the plaintiff's damages in a civil conspiracy flows from overt acts). A plaintiff cannot prevail if the defendants

---

should have acted in spite of Mr. Grady's refusal of medical attention, "the Fourteenth Amendment prohibits only deliberate indifference to a detainee's medical condition, and not mere unreasonable failures to act." *Xing Qian*, 168 F.3d at 956.

did not cause any injury above and beyond the torts that they allegedly conspired to commit. *See Niehus v. Liberio*, 973 F.2d 526, 531-32 (7th Cir. 1992) (noting the mootness of a civil conspiracy charge where the actual conspiracy does not inflict any harm above and beyond the torts that the defendants allegedly conspired to commit).

In fact, it is Moore's failure to provide any evidence of an injury above and beyond Mr. Grady's alleged beating—specifically that the cover-up impacted Moore's ability to vindicate his rights in a court of law—that dooms his conspiracy claim. The Seventh Circuit has recognized that the true basis for a Section 1983 conspiracy claim involving a police cover-up lies in the denial of a plaintiff's right of access to the courthouse. In *Bell v. City of Milwaukee*, 746 F.2d 1205, 1261 (7th Cir.1984), the plaintiff's son was killed by a police officer. Defendants were found liable for conspiring to deny plaintiff's due process right of access to the courts by concealing the true circumstances surrounding the victim's death until twenty years had passed. The father, lacking crucial information about his son's death, had been forced to settle for a paltry sum. As the Seventh Circuit later explained, the "cornerstone of our decision in *Bell* was that the conspiracy had prevented a full and open disclosure of facts crucial to the cause of action, rendering hollow the plaintiffs' right of access." *Vasquez v. Hernandez*, 60 F.3d 325, 329 (7th Cir.1995).

In the instant case, Moore suspected that his father had been beaten to death in the police station, (R. 128, Pl.'s Resp. to Defs.' Facts ¶ 73), and the family immediately procured a second autopsy based on their belief that the medical examiner's conclusion that Mr. Grady died solely of natural causes was a cover-up of police wrongdoing, (*Id.* ¶ 75). Moore has presented no evidence that the alleged conspiracy prevented a full and open disclosure of facts crucial to the

20

cause of action, that he had been prevented from pursuing a tort action in state or federal court, or that the value of such an action was reduced by the cover-up. *See Vasquez*, 60 F. 3d at 329. Moore filed suit almost immediately after Mr. Grady died and has since asserted that it became clear, during discovery, that Mr. Grady "died from the wrongful acts of the Defendants, not from natural causes." (R. 96, Pl.'s Resp. to Defs.' Mot. to Dismiss at 7.) Accordingly, we grant Defendants' motion for summary judgment with respect to Moore's civil conspiracy claim. Because summary judgment has been granted on all of the claims involving defendants Garza and Morales, they are dismissed from this suit.[5]

## IV. Statute of Limitations

Defendants argue that they are entitled to summary judgment because Moore added defendants Tuleja, Boyle, Miller, Palmsone and Williamson to the lawsuit after the statute of limitations had run, even though Moore was in possession of documents well within the statute of limitations period that indicated which officers were present in the lockup and held supervisory positions. Section 1983 does not contain an express statute of limitations; therefore, federal courts have adopted the forum state's statute of limitations for personal injury claims. *Fillmore v. Page*, 358 F.3d 496, 508 (7th Cir. 2004). In Illinois, the statute of limitations is two years "after the cause of action accrued." 735 ILCS 5/13-202 (2005).

Mr. Grady died on April 9, 2003. Moore's first four complaints named only two individual defendants: officers Leo Morales and Luis Garza. In the fifth amended complaint filed October 7, 2005, Moore added the additional defendants. The latest complaint was filed

---

[5]Because Garza and Morales are being dismissed from the suit, Defendants' qualified immunity argument is moot.

21

more than two years after Mr. Grady's death. Defendants contend that in February 2005, they tendered discovery to Moore that listed the names of the lockup personnel and supervisors who had direct contact with Mr. Grady on the night of his death. This Court had previously denied Defendants' motion to dismiss the fifth amended complaint on statute of limitations grounds, holding that "Moore's factual allegations, even though they do not point to a specific date of discovery of the additional defendants' wrongdoing, are sufficient to establish a defense to the statute of limitations *if proven*." *Moore v. Morales*, 415 F. Supp. 2d 891, 895 (N.D. Ill. 2006) (emphasis added). Moore has offered no evidence pertaining to the statute of limitations issue.

Defendants state that "Plaintiff admits in his response that he received discovery from Defendants in February of 2005," and that the discovery tendered to Plaintiff was the Office of Professional Standards Extraordinary Occurrence file ("Kajari Report"), which contained the names of the lockup personnel and supervisors who had direct contact with Mr. Grady. (R. 95, Pl.'s Resp. to Mot. to Dismiss ¶ 22.) While Moore admits that he received discovery in February of 2005, he does not indicate what discovery was received. In fact, Moore stated that:

> Counsel for the Defendants initially tendered to current counsel exactly forty-seven pages of discovery in February of 2005. Even though counsels for the Defendants were obligated to tender to opposing counsel all reports and documents that were generated by the Defendants and other investigating units, many of the documents that were dated around the time of the incident were not immediately tendered to counsel for some reason. As a result of dozens of subpoenas issued by current counsel for the Plaintiff beginning in June of 2005, as well as a few motions to compel, Defendants' counsel has now tendered to Plaintiff's counsel nearly an additional 100 pages of documents and photographs most, if not all, of which were generated by the Chicago Police and Fire Departments within one week of Mr. Grady's death on April 9, 2003.

(*Id.* ¶¶ 22-24.) Thus, it is not clear if the Kajari Report was received as a part of the February 2005 discovery or as a part of discovery tendered to Moore at a much later date. This Court has

22

reviewed the document and finds that there is no date to indicate when Defendants sent the document to Moore. The only date stamped on the document is July 15, 2004, and it is not clear what the significance of this date is. (R. 125, Pl.'s Resp. to Mot. for Summ. J., Ex. M, Kajari Report.) Defendants also do not attach any other documentation that would indicate when this document was turned over to Moore. Therefore, we cannot dismiss Moore's argument that he was unable to determine the officers' names prior to the expiration of the limitations period without evidence to the contrary.

Defendants further argue that because Moore theorized from the moment he saw his father's injuries at the morgue that Mr. Grady had been beaten to death by the police, then Moore cannot say with conviction that he was unable prior to October 7, 2005 to put these defendants on notice of this lawsuit. However, having a theory that something happened and knowing who did it are two different things. If Defendants did not turn over the proper discovery until two years after Mr. Grady died and Moore was not able to discern who may have been responsible for Mr. Grady's death until he received these documents, then the statute of limitations does not bar this claim. *Barry Aviation v. Land O'Lakes Mun. Airport Comm'n et al.*, 377 F.3d 682, 688 (7th Cir. 2004) (*quoting United States v. Duke*, 229 F.3d 627, 630 (7th Cir. 2000)) (stating that the discovery rule postpones the beginning of the limitations period from the date when the plaintiff is wronged to the date when he discovers that "he has been *injured*" and "who *caused* the injury") (emphasis in original). Accordingly, the motion for summary judgment based on the statute of limitations is denied.

## V.      Official Capacity Claims

Despite this Court's earlier ruling dismissing Defendants in their official capacity, *see*

23

*Moore*, 415 F. Supp 2d at 892 n.1, Moore continues to name all of the defendants to this lawsuit in both their individual and official capacities. This Court reiterates that the lawsuit against the defendants in their official capacity is dismissed because "an official capacity suit seeking damages is simply an action against the municipality for which the officer is an agent." *See Monell v. New York Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) ("a municipality cannot be held liable solely because it employs a tortfeasor"). Since Moore does not identify an unconstitutional policy or practice that implicates the City or the CPD, he cannot sue Defendants in their official capacities. *Luck v. Rovenstine*, 168 F.3d 323, 325 (7th Cir. 1999) (stating that a suit against the defendant officer in his official capacity is really a suit against the municipality and a municipality can only be liable for wrongs that they themselves cause).

## CONCLUSION

Defendants' motion for summary judgment (R. 112-1) is granted in part and denied in part. Because of the unanswered material issues surrounding the unfortunate and tragic death of Mr. Grady, summary judgment is denied as to Moore's claims for excessive force and failure to intervene. Summary judgment is also denied as to Defendants' statute of limitations defense. Summary judgment is granted as to Moore's probable cause, failure to seek medical care, and civil conspiracy claims. Defendants Garza and Morales are dismissed from this lawsuit, and all claims against Defendants in their official capacity are dismissed in their entirety.

We pause here to note that this is far from the strongest lawsuit brought on behalf of the estate of someone who has died in police custody. However, our role is not to reject weak lawsuits and only allow strong lawsuits to proceed to trial. We again urge Mr. Grady's relatives and the remaining defendants to re-evaluate their final settlement positions. This is a classic weak liability lawsuit with a strong damage potential and parties should try to avoid the "all or nothing" result that a trial will present. Unfortunately, a trial may not answer the key questions that remain about the circumstances surrounding Mr. Grady's final hours in custody. Therefore, Mr. Grady's relatives may well find the trial to be a less than satisfactory experience. Furthermore, the Court will be required to enforce a more stringent standard of proof in ruling on the motion for judgment as a matter of law that Defendants are certain to file at the close of Plaintiff's evidence during the trial.

A status hearing will be held on August 31, 2006 at 9:45 a.m. in open court to set this lawsuit for trial and set a schedule which will ensure a fair and efficient proceeding.

25

ENTERED:

**Judge Ruben Castillo**
**United States District Court**

**Dated:** August 16, 2006